**REMCO INDUSTRIES, INC.**

v.

**UNITED STATES.**

C.D. 3460;  Protest Nos. 60/6764–
23256–59, etc.

United States Customs Court,
Second Division.

May 29, 1968.

Sharretts, Paley, Carter & Blauvelt,
New York City (Gail T. Cumins and
Crawford Shaw, of counsel), for plain-
tiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen.
(Arthur H. Steinberg and Steven R.
Sosnov, New York City, trial attorneys),
for defendant.

Before RAO, Chief Judge, and FORD
and WATSON, Judges.

WATSON, Judge:

These protests are directed against the classification made by the collector of certain badminton nets under paragraph 1312 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, at the rate of 30 per centum ad valorem, plus 25 cents per pound, as manufactures in chief value of rayon, not specially provided for.

Plaintiff claims the merchandise properly classifiable under paragraph 923 of said act, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, supplemented by T.D. 53877, at the rate of 15 per centum ad valorem as badminton nets, wholly or in chief value of cotton.

In support of its claim and to overcome the presumption of correctness attaching to the collector's classification of the imported merchandise, plaintiff produced evidence in the form of a certified commission of Mr. Hiraga, president and managing director of the Japanese manufacturer, who testified therein by way of certain interrogatories and cross-interrogatories as to the relative weights and cost of materials used in the manufacture of the involved badminton nets (plaintiff's collective exhibit 1). For purposes of easy reference, the designation I with the relevant numbers will be used herein to designate the direct interrogatories, and the designation XI with its particular numbers will be employed to indicate reference to cross-interrogatories.

The defendant, at the trial, objected to certain portions of the testimony of Mr. Hiraga, and also moved to strike from the record the information contained in exhibit A of plaintiff's exhibit 1 as hearsay. Decision as to the admissibility of the answers to certain interrogatories and cross-interrogatories was reserved. Counsel for the defendant in its brief (page 16) after reserving its objection to the information contained in exhibit A of plaintiff's exhibit 1, states as follows:

* * * The Government withdraws the rest of its objections to the answers in the interrogatories in order to present to the court a full picture of the bases of the evidence, its inconsistencies, and its contradictions. * *

With respect to the construction of the badminton nets, Mr. Hiraga testified that the imported badminton nets consisted of (a) a net portion which was mixed yarn composed of cotton and staple fiber; (b) the tape portion which was of all rayon; (c) the sewing thread portion which was of all cotton; and (d) the string portion which was of a mixed yarn of cotton and staple fiber. (I.7–8.)

With respect to the net portion, Mr. Hiraga testified that the cotton cost ¥180 [1] per pound and the staple fiber (rayon) cost ¥95 [2] per pound. (I.9.) He further stated that the cotton weighed 11.32 grams and the rayon 15.18 grams (I.10.) However, Mr. Hiraga subsequently stated that the information given by him in response to plaintiff's interrogatory No. 10 was "not based on my personal knowledge" (XI.22.) but that the information given was "based on the result of a test obtained at the Nagoya City Industrial Laboratory on November 21, 1958." (XI.24.) It is noted that no copy of the results of this test is included in the record herein nor is there any reference to the testing methods employed by the laboratory to support the answer given by plaintiff's witness to direct interrogatory No. 10.

Further, in contravention to the answer given by plaintiff's witness to direct interrogatory No. 10, it is pertinent to note that the chart, "Exhibit A" (attached to the direct interrogatories) indicates that the cotton in the net portion weighs 8.32 grams and the rayon 4.68 grams. As to whether the figures in the chart "are a true and accurate representation of the facts", Mr. Hiraga tes-

1. ¥ 180 per pound = ¥0.40 per gram, there being 453 grams to a pound.

2. ¥ 95 per pound = ¥0.21 per gram.

tified that "I believe they are appropriate on the whole." (I.15.) We are thus left with a definite conflict between the answers given in direct interrogatory No. 10 as to the weights of the cotton and rayon in the net portion and the information given in this regard in "Exhibit A". Accordingly, the answers given by plaintiff's witness to direct interrogatory No. 10 must be viewed as being without solid foundation to support plaintiff's claim as to the validity of the information given therein.

In cross-interrogatory No. 17, addressed to plaintiff's witness, there appears the following:

[Q.] Please explain in detail how you computed the unit cost of the cotton and rayon yarns shown in Plaintiff's exhibit A.—[A.] Computation was based on the information on the unit price per pound at the time of the purchase, which is found in the economic newspapers, and Textile newspapers, and other information obtained from thread stores.

In our opinion, the objection made by counsel for the defendant as to the answer given by plaintiff's witness Hiraga in cross-interrogatory No. 17, is well taken. It is too general and lacks specific information and data in order to establish on plaintiff's part the unit cost of the cotton and rayon in the involved merchandise and in no way can be taken as proof of plaintiff's claim in this respect.

With respect to the tape portion in the imported merchandise, Mr. Hiraga testified as follows:

* * * As to the tape, we purchased it in a complete form from a tape store, since we are not a tape maker. It was bought at a set price for one (1) roll of 200 ft. * * * [I.8.]

* * * As the tape was bought in a finished form, I know only the price for finished goods, for which a price is set for 100 shaku [3] in length and 1 inch in width. * * * *It is not definite* but generally is 24–25 yen. [Emphasis supplied.] [I.9(b).]

I do not know [the cost of the rayon per pound], for we buy the goods in a complete form. [XI.19.]

Plaintiff's witness further testified:

The tape portion is made of staple fibre rayon. Its weight is 18.18 gr. * * * [I.10.]

It appears pertinent to note that exhibit A (in plaintiff's exhibit 1) lists the tape portion as weighing 8 grams, a statement inconsistent with the answer given in direct interrogatory No. 10 as to its weight. The indefiniteness of the above answers in response to the inquiries of the respective counsel are not sufficiently probative to establish on plaintiff's part the value of the tape portion at the time it became a part of the completed badminton net and in this respect plaintiff's proof is lacking in its attempt to establish overall that the involved merchandise is a manufacture, "wholly or in chief value of cotton".

Plaintiff's witness, in response to interrogatories of counsel, testified with respect to the sewing thread portion in the badminton nets, as follows:

* * * The sewing thread * * was also purchased in a complete form. * * * [I.8.]

As the sewing thread is sold in the bobbin in a complete form neatly packed, I bought it in that form; *I do not know how much it was per pound.* [Emphasis supplied.] [I.9(c).]

In sewing a 12 ft. of net, * * * it probably takes about 15 shaku, *I imagine, for I don't exactly remember if it was ever measured.* [I.10.] [Emphasis added.]

and in cross-interrogatory No. 21:

[Q.] How do you know the cost of the cotton per pound that was used in the manufacture of the sewing thread portion, as stated in your answer to Plaintiff's Interrogatory No.

---

3. "shaku" is defined in Webster's Third New International Dictionary (1966) as "a Japanese unit of length equal to 11.93 inches."

9?—[A.] As we buy goods in a complete form, I don't know the cost.

The answers of plaintiff's witness with respect to the thread, as indicated above, are, in our opinion, likewise inconclusive in support of plaintiff's claim.

With respect to the "string" portion in the badminton nets at bar, a review of the testimony of plaintiff's witness (plaintiff's exhibit 1) persuades us that the answers given by him to the interrogatories and cross-interrogatories on this matter suffer the same disability as the answers given with respect to other portions of the badminton nets. The information given by plaintiff's witness respecting the string portion was either not based on his personal knowledge (XI. 22, 24), or the figures given in the chart, exhibit A attached to plaintiff exhibit 1, do not properly reflect the value of the cotton and rayon in said portion so as to determine the costs of the separate component materials therein.

Defendant, in support of the collector's classification, called three witnesses, the first of whom was Roy K. Dewing, Jr., supervising customs examiner in the appraiser's office, Newark, New Jersey, at the time of the involved importations. He testified that he was in charge of the appraiser's office at Newark in 1958 and 1959 during the period when entries N–1307, N–2106, N–2107, and N–2250 covering the involved importations were processed. (R.27.) The merchandise is described in said entries as badminton nets. Mr. Dewing testified that the practice in his office during the period in question, with respect to the sampling of merchandise, was to remove one sample from each shipment and identify it, for customs analysis, with a label, Customs Form 6479 (defendant's exhibit A) properly filled out with relevant information and then in every case to forward the sample, together with the identifying label, to the customs laboratory. (R. 28–29.)

Defendant also called Mr. Isadore Schnopper, presently assistant chief chemist in charge of the New York Customs Laboratory, who had likewise held this position during the period of the involved importations. His qualifications and experience were conceded by counsel for the plaintiff. The witness testified that his duties "are chiefly supervisory, supervising the work of the customs laboratory and from the beginning of the recording of a sample into our log book and to the final report of the sample after it has been analyzed." (R.34.) Describing the procedure taken by his office upon receipt of a sample, Mr. Schnopper stated that a clerk in his office takes such information as is contained in Customs Form 6479 and places it in a "log book" that is kept for all samples sent to the laboratory for analysis. The log book is used in the regular course of business as a permanent record and the information placed thereon was under the immediate supervision of the witness. (R.36–37.) Xerox copies of certain log pages were thereupon received in evidence as defendant's collective exhibit B. These copies disclose that the four entry numbers involved in the shipments under consideration, appear on the defendant's collective exhibit B. Mr. Schnopper stated that the information found on the log sheets was taken from Customs Form 6479.

Further describing the procedure upon receipt of samples in the customs laboratory, Mr. Schnopper testified that after completing the log sheet, the clerk fills out the upper portion of another form, Customs Form 6485 (defendant's collective exhibit C), which contains practically the same information as found in Customs Form 6479, the lower portion being reserved for the chemist to write in his report. Customs Form 6485 and the sample connected with it, is then sent to the proper laboratory room for analysis of the sample. Reference to defendant's collective exhibit C (Customs Form 6485) contains information thereon which refers to entries N–1307, N–2106, N–2107, and N–2250, the entries involved in the importations at bar. The record herein subsequently disclosed that the samples of the involved merchan-

dise together with Customs Form 6479 attached thereto, were disposed of by the customs laboratory for lack of space.

Defendant's third witness was Miss Amelia Eaton, a chemist in the textile division of the customs laboratory. She testified that she had been in such position during the period of the involved importation. Her qualifications as an expert chemist were conceded by counsel for the plaintiff. (R.78.)

Miss Eaton testified that in the course of her duties she received samples of badminton nets for analysis identified by Customs Form 6479 with attached cards, Customs Form 6485, bearing respectively entry numbers N–1307, N–2106, N–2107, and N–2250. She testified that as a standard practice she checked the information from the upper part of the Customs Form 6485 and compared it with the main information on Customs Form 6479 and that the information on Customs Form 6485 was the same as that given on Customs Form 6479. (R.80–82.) While it does not appear that the witness had any "independent recollection" of this fact, she testified that if the information on Customs Form 6479 were different from that given on Form 6485, she would have had Form 6485 corrected but that there were no such corrections on any of Customs Forms 6485 (defendant's exhibit C).

Miss Eaton further testified that she was requested to identify the component materials in the nets and give their percentage weights and that, accordingly, she did a microscopic analysis of each component. She stated that she found that the tape portion of the net was composed wholly of rayon yarns; the net portion was composed of a mixture of cotton and rayon; the string portion was composed of a mixture of cotton and rayon, and the fasteners were composed of a nontextile, vinyl plastic material. The witness stated that she did not determine anything with reference to the sewing thread portion of the net as "it was a very insignificant part of the net." Defendant's witness further stated that to determine the amount of cotton and rayon that was in the net portion and the string portion of the involved articles, she performed a chemical analysis by a test prescribed by the Bureau of Customs and approved by a group of professional chemists. The results of such tests are indicated in the laboratory reports signed by her covering entries N–1307, N–2106, N–2107, and N–2250. The component materials are expressed in percent by weight and the net weight of the entire sample in each case is shown on the reports. (R.88.)

On cross-examination, Miss Eaton testified that she did not know of her own knowledge whether or not the samples tested by her were in fact samples taken from the involved shipment. (R.92.)

On redirect examination, Miss Eaton testified that the information on the laboratory reports in the official papers which were identified as Customs Form 6415, were taken from the figures on the front of the Customs Form 6485 (defendant's collective exhibit C) and that the figures on Customs Form 6485 and the figures on the laboratory reports (Customs Form 6415) are the same. (R.99.)

It is well settled that the collector's classification carries with it a presumption of correctness and that the importer has the dual burden of showing that the collector's classification is wrong and that his claimed classification is correct. Edward Hyman Co. v. United States, 52 CCPA 51, C.A.D. 857, and in cases of this nature, there is a further presumption that the collector found all the necessary facts to exist to support his classification. Novelty Import Co., Inc. v. United States, 53 CCPA 28, 32, C.A.D. 872; Kaysing v. United States, 49 CCPA 69, C.A.D. 798; United States v. John A. Steer Co., 46 CCPA 132, C.A.D. 715; United States v. Marshall Field & Co., 17 CCPA 1, T.D. 43309.

In the case at bar, the basic inquiry is as to the determination of the component material of chief value. It is well settled that in such determination, the proper method is to prove the

costs of the separate component materials to the manufacturer at the time they are ready to be combined to make the completed article. United States v. H. A. Caesar & Co., 32 CCPA 142, C.A.D. 299; United States v. Rice-Stix Dry Goods Co., 19 CCPA 232, T.D. 45337; United States v. Bacharach, 18 CCPA 353, T.D. 44612. In our opinion, plaintiff in this case has not overcome the burden imposed upon it, specifically as to establishing the respective costs of the component materials in the imported merchandise. As heretofore indicated, the information as to the costs of the separate materials and the various factors upon which these costs were based were in greater part not within the personal knowledge of plaintiff's witness but were based upon hearsay information. Mr. Hiraga testified in effect that the information upon which he computed the unit cost of the cotton and rayon yarns in the involved merchandise, as indicated in exhibit A attached to the direct interrogatories, was obtained from "economic newspapers, and Textile newspapers, and other information obtained from thread stores." (XI.17.) However, no books or records of plaintiff company were introduced either to support the information alleged to have been obtained from other sources or to establish, in the first instance, the claimed costs, a procedure which, in our opinion, would have more accurately and substantially supported the allegations of plaintiff's witness as to costs with relation to the component materials.

Further, in the light of the contradictions as indicated between the answers of plaintiff's witness to the interrogatories and cross-interrogatories and the statements as to costs and weight of materials as given in "Exhibit A", we can give little or no weight to the information listed in said exhibit. As heretofore pointed out, the information in direct interrogatory No. 10 completely contradicts that given in "Exhibit A".

One further note may be made concerning the absence of samples in this case. While the samples taken from the importations at bar were not retained by the customs laboratory, the evidence in the case at bar clearly shows, in our opinion, that the entries covering the involved importations were related to the samples of the badminton nets which were tested by the Government's witness. Further, the testimony of the Government's witnesses as to laboratory procedure upon receipt of samples presents, in our opinion, a chain of evidence linking the merchandise at bar to the laboratory analyses. This is clearly indicated by the corresponding entry numbers and other "marks" on the laboratory reports and in Customs Form 6485 (defendant's collective exhibit C) which contains practically the same information as found in Customs Form 6479, the latter being the form which was sent together with the samples to the laboratory. It is presumed that public officials perform their duties in the manner required by law and it is, therefore, incumbent upon an importer to prove otherwise. (Olavarria & Co., Inc. v. United States, 47 CCPA 65, C.A.D. 729.) See also, Henry A. Wess, Inc. v. United States, 54 CCPA ——, C.A.D. 910. Plaintiff in this case has not shown anything contrary to established procedures with respect to the analysis of samples sent to the customs laboratory.

On the basis of the record presented in this case, we are of opinion and hold that the plaintiff has failed not only in rebutting the presumption that the involved badminton nets are properly dutiable under paragraph 1312 of the Tariff Act of 1930, as modified, supra, as manufactures in chief value of rayon, not specially provided for, as classified, but in addition has failed to prove that the merchandise at bar is properly classifiable under paragraph 923, as modified, as badminton nets wholly or in chief value of cotton, not specially provided for, as claimed. Accordingly, the protests in these cases are overruled.

Judgment will issue accordingly.

RAO, Chief Judge, and FORD, Judge, concur.